**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| WILLIAM McNEIL, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC. and MARRIOTT INTERNATIONAL, INC. CORPORATE BENEFITS DEPARTMENT,<br><br>Defendants. | Civil Action No. 25-2975-TDC |

## MEMORANDUM OPINION

Plaintiff William McNeil has filed this putative class action against his employer, Marriott International, Inc. ("Marriott"), and the Marriott Corporate Benefits Department ("the Benefits Department"), in which he alleges that Defendants required tobacco users to pay an unlawful surcharge for healthcare coverage, failed to provide adequate notice relating to that surcharge, and breached their fiduciary duties in their treatment of the funds collected from that surcharge, in violation of various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1193c; the Public Health Service Act ("PHSA"), 42 U.S.C. §§ 300gg–300gg-139; and related regulations. Defendants have filed a Motion to Dismiss the Amended Class Action Complaint, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local. R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. Statutory Framework

ERISA and the PHSA prohibit any group health plan from requiring certain participants to pay a higher premium based on a "health status-related factor." 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). Specifically, those statutes state that:

> A group health plan . . . may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). A group health plan may, however, establish "premium discounts or rebates or modify[] otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2); 42 U.S.C. § 300gg-4(b)(2).

The PHSA places certain conditions on such programs of health promotion and disease prevention. *See* 29 U.S.C. § 1185d(a)(1) (stating that certain provisions of the PHSA "shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans"). Specifically, the PHSA provides that "[i]f any of the conditions for obtaining a premium discount or rebate or other reward for participation in a wellness program is based on an individual satisfying a standard that is related to a health status factor," that wellness program must comply with certain requirements. 42 U.S.C. § 300gg-4(j)(1)(C). Those requirements include that:

> (D) The full reward under the wellness program shall be made available to all similarly situated individuals. For such purpose, among other things:
>
>> (i) The reward is not available to all similarly situated individuals for a period unless the wellness program allows—

> (I) for a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard; and
>
> (II) for a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.

42 U.S.C. § 300gg-4(j)(3)(D).

The regulatory framework for "[p]rohibiting discrimination against participants and beneficiaries based on a health factor" further defines the contours of a reasonable alternative standard. 29 C.F.R. § 2590.702; 45 C.F.R. § 146.121. Those requirements differ depending on the type of "wellness program" that the group health plan requires in order to obtain a "reward," which the regulations define as including "avoiding a penalty (such as the absence of a premium surcharge or other financial or nonfinancial disincentive)." 29 C.F.R. § 2590.702(f)(1)(i); 45 C.F.R. § 146.121(f)(1)(i). As relevant here:

> An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward. To comply with the rules of this paragraph (f), an outcome-based wellness program typically has two tiers. That is, for individuals who do not attain or maintain the specific health outcome, compliance with an educational program or an activity may be offered as an alternative to achieve the same reward. This alternative pathway, however, does not mean that the overall program, which has an outcome-based component, is not an outcome-based wellness program. That is, if a measurement, test, or screening is used as part of an initial standard and individuals who meet the standard are granted the reward, the program is considered an outcome-based wellness program.

29 C.F.R. § 2590.702(f)(1)(v); 45 C.F.R. § 146.121(f)(1)(v). "The full reward under [an] outcome-based wellness program must be available to all similarly situated individuals." 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv). In addition:

> [A] reward under an outcome-based wellness program is not available to all similarly situated individuals for a period unless the program allows a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual who does not meet the initial standard based on the measurement, test, or screening.

29 C.F.R. § 2590.702(f)(4)(iv)(A); 45 C.F.R. § 146.121(f)(4)(iv)(A).

The PHSA also imposes a requirement that a group health plan provide notice of the availability of a reasonable alternative standard:

> The plan or issuer involved shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under subparagraph (D). If plan materials disclose that such a program is available, without describing its terms, the disclosure under this subparagraph shall not be required.

42 U.S.C. § 300gg-4(j)(3)(E). Under the applicable regulations, adequate notice requires "including contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated." 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v).

## II. The Marriott Health & Welfare Benefit Plan

Marriott and the Benefits Department sponsor, maintain, and manage the Marriott Health & Welfare Benefit Plan ("the Plan"), which provides health insurance coverage for Marriott employees and, as of December 31, 2023, had over 80,000 participants. The Plan is an "employee welfare benefit plan" governed by ERISA. 29 U.S.C. § 1002(1) (defining an "employee welfare benefit plan" as including a plan "established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness"); 29 U.S.C. § 1003 (stating that ERISA applies to such plans if they are established or maintained "by any employer engaged in commerce or in any industry or activity affecting commerce"). Marriott is the sponsor of the Plan, and the Benefits Department is

the designated Plan Administrator. As the designated Plan Administrator, the Benefits Department is a named fiduciary of the Plan with responsibility and authority over the Plan's general administration and operation. Under the Marriott Health & Welfare Benefit Plan Document ("the Plan Document"), the Benefits Department "shall have the exclusive right and discretion to interpret the terms and conditions of the Plan and to decide all matters arising with respect to the Plan's administration and operation." Plan Document ¶ 8.01(b), Mot. Ex. 1, ECF No. 39-1.

## III. The Tobacco Surcharge

Plaintiff William McNeil is a Marriott employee who uses tobacco. Under the Plan, in order to maintain health insurance, tobacco users must pay, in addition to their share of the health insurance premium, a tobacco surcharge of $15 per week per user covered by the Plan, or approximately $780 per user annually. Thus, McNeil's paystub for the week ending on August 8, 2025 shows a $15 "Tobacco Surcharge" withheld as a pre-tax deduction from his pay. Am. Compl. ¶ 48, ECF No. 36. McNeil alleges that a participant who uses tobacco has no opportunity to avoid paying at least some portion of the annual tobacco surcharge. Specifically, McNeil asserts that although the Plan does not require tobacco users to pay the surcharge after completing a smoking cessation program during a given Plan year, which consists of a calendar year, *see* Plan Document at 7, it does not reimburse that participant for the surcharges imposed earlier in that year, before the completion of the program.

The 2023 Marriott Benefits Enrollment Guide states on page 8 that Plan "Participants (associates and dependents) who use tobacco may be subject to a weekly tobacco surcharge. See page 28 for information on the free Smoking Cessation Program." 2023 Marriott Benefits Enrollment Guide ("Enrollment Guide") at 8, Mot. Ex. 2, ECF No. 39-2. Page 28 of the Enrollment Guide states, under the heading "FREE Smoking Cessation Program":

> **If you smoke, one of the healthiest things you can do is to quit.** We know it's not easy, but there is help available! Through this program, you can talk to an expert for help and receive free nicotine replacement therapies such as lozenges, gum, and patches. The free Smoking Cessation Program is available to all full-time, part-time, and pool status associates. You don't have to be enrolled in a medical plan to participate.

*Id.* at 28.

In a footnote beneath the notice on page 8, the Enrollment Guide states:

> If you think you may be unable to take steps to quit, you might qualify for an opportunity to avoid the surcharge by different means. Contact the mHUB Service Center, and we will work with you (and, if you wish, with your doctor) to find a wellness program with the same reward that is right for you in light of your health status.

*Id.* Page 2 of the Enrollment Guide states that participants can "[s]peak to a representative or schedule a follow-up conversation through 'Contact Us' on the mHUB home page" and advises them to "[a]ccess the mHUB website at mHUB.marriott.com," to "scan the QR code" that appears on page 2 "to access the site directly," or to "[c]all 1-833-900-mHUB (6482) between 9:00 a.m. and 8:00 p.m. Eastern time, Monday through Friday." *Id.* at 2.

## IV. Contribution Structure

The Plan is funded by employer contributions and before-tax participant contributions. Marriott pays a defined company contribution toward the cost of medical coverage. Participants' contributions are withheld from their paychecks. A participant contribution includes the required premium for the healthcare plan of the participant's choice, as well as any applicable tobacco surcharges for the participant or a dependent covered by the Plan.

The Enrollment Guide illustrates how Marriott shares the costs of the Plan with participants by describing the categories of medical plans available to participants. Under a "Gold" plan, for example, the Plan generally "provides 90% co-insurance, which means it will pay 90% of your in-network covered services once you have paid your deductible," subject to "low copays for routine

services like doctor visits and generic drugs." Enrollment Guide at 6. The "HDHP" plans, on the other hand, provide that a participant will pay a certain higher deductible "before the plan pays for any medical care other than preventative care," and that after the participant pays that deductible, the Plan will pay a certain lower percentage of in-network covered services. *Id.* Each plan is estimated to cost participants a certain amount per week that is withheld from their paychecks. *Id.* For example, a Gold plan is estimated to cost $60 per week, while a "Safety Net HDHP" plan is estimated to cost $15 per week. *Id.* at 8. In addition to that premium, any applicable "weekly tobacco surcharge" is also withheld from participants' paychecks. *Id.*; Am. Compl. ¶ 48.

The Plan Document further provides that:

> Except as may otherwise be required by law, any amount by which a Participant's Compensation is reduced by reason of an election made under this Plan will remain part of the general assets of the Employer. Except as specifically provided in the Supplemental Documents, nothing herein will be construed to require any Employer or the Plan Administrator to maintain any fund or segregate any amount for the benefit of any Enrolled Person.

Plan Document ¶ 10.04.

McNeil alleges that Marriott collected more tobacco surcharge funds than permitted by regulation in order to reduce Marriott's funding obligations to the Plan. McNeil further alleges that Marriott diverted those funds to its own accounts, earned interest on those funds, and failed to remit the full employer contribution owed to the Plan.

## V. Procedural History

McNeil filed the original Complaint in this case on September 9, 2025 and the operative Amended Complaint on December 12, 2025. In the Amended Complaint, McNeil alleges four claims against Defendants in the following numbered counts: (1) an unlawful tobacco surcharge based on the failure to provide a reasonable alternative standard, in violation of ERISA, 29 U.S.C. § 1182(b), the PHSA, 42 U.S.C. § 300gg-4(j)(3)(D), and applicable implementing regulations; (2)

an unlawful tobacco surcharge, based on the failure to provide required notice, in violation of ERISA, 29 U.S.C. § 1182(b), the PHSA, 42 U.S.C. § 300gg-4(j)(3)(E), and applicable implementing regulations; (3) a breach of a fiduciary duty to the Plan, in violation of ERISA, 29 U.S.C. §§ 1104, 1106, 1109; and (4) a breach of a fiduciary duty to individual Plan participants, in violation of ERISA, 29 U.S.C. §§ 1104, 1106, 1109.

## DISCUSSION

In the Motion, Defendants argue that McNeil (1) lacks standing under Article III of the United States Constitution to assert his claims; (2) lacks statutory standing to bring his claims of an unlawful tobacco surcharge in Counts 1 and 2; (3) fails to state a claim of an unlawful tobacco surcharge in Count 1 based on the failure to provide a reasonable alternative standard because the Plan does not provide tobacco users who complete the smoking cessation program retroactive reimbursement for the full amount of tobacco surcharges paid during a Plan year; (4) fails to state a claim of an unlawful tobacco surcharge in Count 2 based on the failure to provide adequate notice of a reasonable alternative standard; (5) fails to state a claim for a breach of fiduciary duty in Counts 3 and 4; (6) fails to state a claim in Count 3 because of the absence of allegations showing a loss to the Plan; and (7) fails to state a claim in Count 4 because of the unavailability of monetary relief for such a claim.

### I. Legal Standards

Except in relation to the standing argument addressed below, Defendants' arguments seek dismissal for failure to state claim pursuant to Federal Rule of Civil Procedure 12(b)(6). To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Here, Defendants have attached to their Motion the Plan Document, the Enrollment Guide, and the Summary Plan Description, as well as a frequently asked questions sheet on Medical Plan Costs for Tobacco Users ("the FAQs") and screenshots from a website used for enrollment in the Plan. Where the Amended Complaint expressly references the Plan Document, the Enrollment Guide, and the Summary Plan Description, and McNeil does not challenge their authenticity, the Court finds that those documents are integral to the Amended Complaint and may be considered in resolving the Motion. Where the Amended Complaint does not reference the FAQs or the enrollment website, the Court will not consider those documents.

## II. Article III Standing

Defendants first assert that McNeil lacks standing to assert his claims in Counts 1, 2, and 4 because he has not plausibly alleged that he has suffered an injury traceable to the alleged violations asserted in those counts.

Article III of the Constitution limits the federal judicial power to resolving "Cases" or "Controversies." U.S. Const. art. III § 2; *Ansley v. Warren*, 861 F.3d 512, 517 (4th Cir. 2017). Accordingly, whether a plaintiff has identified an actual case or controversy, and thus has standing to advance that case, is a question of subject matter jurisdiction. *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). The "irreducible constitutional minimum" requirements to establish standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant: and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). In a class action case, courts "analyze standing based on the allegations of personal injury made by the named plaintiff." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017).

As to Counts 1, 2, and 4, Defendants do not dispute that the weekly $15 tobacco surcharge deducted from McNeil's paycheck is a concrete and particularized injury-in-fact. *See TransUnion LLC v. Ramirez* ("*TransUnion*"), 141 S. Ct. 2190, 2204 (2021) (noting that monetary harms "readily qualify as concrete injuries"). Defendants, however, argue that because McNeil has not participated in Marriott's smoking cessation program, and thus has not been deprived of the retroactive reimbursement of the tobacco surcharge that he alleges to be required by law, his injury is due only to his own use of tobacco and is not traceable to any unlawful application of the tobacco surcharge as alleged in Count 1. Defendants further argue that because McNeil has not alleged

that he read the Plan materials at issue for his claims of inadequate notice in Counts 2 and 4, any injury is not traceable to the absence of any required disclosure.

Traceability requires "a causal connection between the injury and conduct complained of," *Lujan*, 504 U.S. at 560, but "does not require that a defendant's actions be the sole or even immediate cause of [a plaintiff's] injury," *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025). Here, McNeil's injury of having to pay the tobacco surcharge is traceable to Defendants' failure to provide the allegedly required reimbursements because a failure to comply with the PHSA requirements renders the entire tobacco surcharge unlawful as to any Plan participant. ERISA and the PHSA generally prohibit a surcharge based on "any health status-related factor" such as tobacco use, unless it is imposed through the use of "premium discounts or rebates . . . in return for adherence to programs of health promotion and disease prevention," such as a wellness program requiring participants not to smoke. 29 U.S.C. § 1182(b); 42 U.S.C. § 300gg-4(b). The PHSA provides that such a "reward is not available to all similarly situated individuals for a period *unless the wellness program allows* . . . for a reasonable alternative standard. 42 U.S.C. § 300gg-4(j)(3)(D) (emphasis added). Because the failure of a wellness program to provide a qualifying "reasonable alternative standard" renders a reward unavailable "to all similarly situated individuals," *id.*, a tobacco surcharge imposed without a reasonable alternative standard would be invalid as to all participants, including McNeil. *See, e.g.*, *Noel v. Pepsico, Inc.*, ___ F. Supp. 3d ___, No. 24-CV-7516 (CS), 2026 WL 558118, at *7 (S.D.N.Y. Feb. 27, 2026) (collecting cases from "several courts [that] have recently held that plaintiffs have standing where they claim that they paid a tobacco surcharge imposed pursuant to a noncompliant wellness program, regardless of whether they were directly impacted by the alleged shortcomings of the program"); *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 2:24-CV-02749-TLP-TMP, 2025 WL 2779899, at *6

(W.D. Tenn. Sept. 26, 2025) (stating that if a "program does not meet the relevant requirements," then "the tobacco surcharge that Plaintiff has been paying is illegal," and "Plaintiff alleges an injury-in-fact").

Defendants' reliance on *Freeman v. Progressive Direct Insurance Co.*, 149 F.4th 461 (4th Cir. 2025), is misplaced. In *Freeman*, the United States Court of Appeals for the Fourth Circuit considered whether a plaintiff had demonstrated traceability when challenging her auto insurance company's allegedly improper practices for appraising the value of a car that was a total loss after an accident. *Id.* at 467. The court held that the plaintiff failed to show that the company caused her an injury because regardless of the amount of the appraisal, the plaintiff's only loss was the payment of the $2,000 deductible because she owed more on her car loan than the value of the car, and the plaintiff had loan payoff insurance that covered any difference between the amount paid by the auto insurance company and the amount owed on her car loan. *Id.* at 464, 467. Here, however, McNeil undisputedly suffered an injury in the form of withheld tobacco surcharge funds that he would not have owed if, as alleged, Defendants failed to comply with the requirements for a tobacco wellness program.

As for the claims relating to inadequate notice, Defendants' argument that McNeil lacks standing because he did not read the Plan documents that allegedly lacked sufficient notice of the wellness program likewise fails. A failure to provide adequate notice would render the wellness program invalid based on the failure to meet the PHSA's requirements for a program of health promotion and disease prevention, such that any tobacco surcharge imposed on anyone, including McNeil, would be invalid. *See Noel,* ___ F. Supp. 3d ___, 2026 WL 558118, at *7; *Bailey*, 2025 WL 2779899, at *6 ("For a wellness program . . . to be lawful, it must satisfy all the relevant requirements."). Thus, the lack of adequate notice is not, as Defendants claim, merely an

"informational injury" with no "downstream consequences." Mot. at 9, ECF No. 38-1 (quoting *TransUnion*, 141 S. Ct. at 2214). Where McNeil's payment of the tobacco surcharge is a monetary harm that is fairly traceable to any allegedly improper notice, the Court finds that McNeil has adequately alleged standing.

McNeil's injury is also redressable. An injury is redressable if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sheppheard*, 143 F.4th at 243. An injury is not redressable if the court is "powerless to provide the very relief" the plaintiff requests. *Id.* Here, McNeil requests remedies that include reimbursement for his previous payment of unlawfully imposed tobacco surcharges and various forms of equitable relief that would bar the future imposition of unlawful tobacco surcharges on McNeil and other tobacco users. Therefore, a favorable decision would redress McNeil's alleged injury. Because McNeil has sufficiently alleged facts demonstrating all required elements of Article III standing in relation to Counts 1, 2, and 4, the Motion will be denied as to this standing argument.

## III. Counts 1 and 2: Unlawful Surcharges

In relation to Counts 1 and 2, Defendants assert that McNeil lacks statutory standing to assert his claims. Defendants also contend that Count 1 must be dismissed because ERISA does not require a group health plan to reimburse a tobacco user retroactively for surcharges paid during a plan year before enrolling in a smoking cessation program, and because the Plan provides employees and their dependents with the same opportunity to avoid a surcharge by participating in a smoking cessation program. As for Count 2, Defendants argue that it must be dismissed because their Enrollment Guide includes the required notice of a reasonable alternative standard to avoid the tobacco surcharge, and because their Summary Plan Description and Plan Document are not required to include such a notice.

### A. "Statutory Standing"

As to Count 1, Defendants argue that McNeil lacks "statutory standing" to bring a claim that the Plan fails to provide a "reasonable alternative standard" because he has not shown that it would be "unreasonably difficult" or "medically inadvisable" for him to participate in the Plan's smoking cessation program. 42 U.S.C. § 300gg-4(j)(3)(D).

"Statutory standing," a concept that is "best understood as not even standing at all," relates to the question of "whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action." *CGM, LLC v. BellSouth Telecomm., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011). In claiming that "statutory standing" bars McNeil's claims, Defendants rely on *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and its requirement that in order to "fall[] within the class of plaintiffs whom Congress has authorized to sue" under a statute, a plaintiff must assert claims that "fall within the zone of interests protected by the law invoked." *Id.* at 128–29.

On the question of whether "a plaintiff's claim . . . fall[s] within the 'zone of interests' protected by the statute," the test "is not especially demanding," and "the plaintiff receives the benefit of any doubt." *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 707 (4th Cir. 2016) (quoting *Lexmark Int'l, Inc.*, 572 U.S. at 129–30). In assessing whether a plaintiff's claim falls within the "zone of interests" protected by a statute, a court applies "traditional principles of statutory interpretation" to analyze the "meaning of the Congressionally enacted provision creating [the] cause of action." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019) (quoting *Belmora LLC*, 819 F.3d at 697).

Defendants assert that the relevant provision of the PHSA, 42 U.S.C. § 300gg-4(j)(3)(D), provides a cause of action only for individuals for whom it is "unreasonably difficult" or

"medically inadvisable" to participate in the smoking cessation program. Mot. at 11. However, as discussed above in relation to Article III standing, the PHSA generally prohibits the imposition of a tobacco surcharge on all participants, including someone like McNeil, unless avoiding the surcharge is "available to all similarly situated individuals." 42 U.S.C. §§ 300gg-4(b)(1), 300gg-4(j)(3)(D); *see supra* part II. Notably, in discussing individuals with the limitations referenced by Defendants, the statute further provides that "[f]or such purpose, *among other things*," avoiding the surcharge "is not available to all similarly situated individuals for a period *unless the wellness program allows*—for a reasonable alternative standard" for individuals for whom it would be "unreasonably difficult" or "medically inadvisable" to quit smoking. 42 U.S.C. § 300gg-4(j)(3)(D)(i) (emphasis added). Consistent with this language stating that "other things" may be required to carry out the purpose of the statute, *id.*, the regulations provide that for a wellness program generally requiring an individual to "not smok[e]" to avoid a surcharge, 29 C.F.R. § 2590.702(f)(1)(v); 45 C.F.R. § 146.121(f)(1)(v), that program must provide "any individual who does not meet the initial standard" of being a non-smoker with a reasonable alternative standard, typically access to a compliant smoking cessation program. See 29 C.F.R. § 2590.702(f)(4)(iv)(A); 45 C.F.R. § 146.121(f)(4)(iv)(A).

Thus, the statutory and regulatory language cannot fairly be read to limit the benefit of avoiding the tobacco surcharge to those for whom stopping smoking would be "unreasonably difficult" or not "medically advisable," and instead demonstrates that the tobacco surcharge paid by McNeil would be invalid as to all Plan participants if Defendants failed to comply with the requirements for imposing a tobacco surcharge, including that a reasonable alternative standard be made available not only to those with the identified limitations, but also to any individual paying the surcharge. 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv)(A); 45 C.F.R. §

146.121(f)(4)(iv)(A); *see supra* part II (citing *Noel,* ___ F. Supp. 3d ___, 2026 WL 558118, at *7, and *Bailey*, 2025 WL 2779899, at *6). Thus, as a Plan participant paying that surcharge, McNeil stands to benefit if the wellness program is invalidated as a means of permitting a tobacco surcharge, regardless of whether he has attempted to complete, or meets the requirements to complete, the smoking cessation program, such that he safely falls within the "zone of interests" of the statute. *Lexmark Int'l, Inc.*, 572 U.S. at 129. The Court therefore will not dismiss these claims based on Defendants' "statutory standing" argument.

**B. Count 1: Full Reward**

In Count 1, McNeil alleges that the Plan's tobacco surcharge violates ERISA and the PHSA because it fails to provide tobacco-using employees who complete the smoking cessation program with the ability to recoup the full amount of surcharges for a Plan year, and because it provides no means by which to recoup the surcharges imposed for employees' dependents who smoke.

In particular, McNeil asserts that the Plan does not make the full amount available because it does not reimburse participants who complete the smoking cessation program at some point later in the Plan year for surcharges paid during the months of the year preceding the completion of the program. McNeil asserts that this practice violates the requirement that, to provide "discounts or rebates" for "adherence to [a] program[] of health promotion and disease prevention," 29 U.S.C. § 1182(b)(2); 42 U.S.C. § 300gg-4(b)(2), such as a wellness program based on not smoking, "the full reward under the wellness program shall be made available to all similarly situated individuals," 42 U.S.C. § 300gg-4(j)(3)(D).

Defendants contend that Count 1 must be dismissed because ERISA requires a group health plan to stop charging a tobacco surcharge only after the tobacco user has enrolled in the smoking cessation program and does not require retroactive reimbursement for surcharges paid earlier in

the plan year. Defendants further assert that the Plan provides employees' dependents with the same opportunity to engage in the smoking cessation program and thereby avoid the tobacco surcharge.

Under the PHSA, "[i]f any of the conditions for obtaining a premium discount or rebate or other reward for participation in a wellness program is based on an individual satisfying a standard that is related to a health status factor," that wellness program must comply with certain requirements, including that "[t]he full reward under the wellness program shall be made available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(1)(C), (D).

Here, the Plan's tobacco surcharge and smoking cessation program are properly construed to be parts of an "outcome-based wellness program," which is defined in the applicable regulations as follows:

> [A]n outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking . . . ) in order to obtain a reward. To comply with the rules . . . an outcome-based wellness program typically has two tiers. That is, for individuals who do not attain or maintain the specific outcome, compliance with an educational program or activity may be offered as an alternative to achieve the same reward . . . . [I]f a measurement, test, or screening is used as part of an initial standard and individuals who meet the standard are granted the reward, the program is considered an outcome-based wellness program.

29 C.F.R. § 2590.702(f)(1)(v); 45 C.F.R. § 146.121(f)(1)(v). The regulations provide an example of such an outcome-based wellness program consisting of a "tobacco use surcharge with smoking cessation program alternative":

> In conjunction with an annual enrollment period, a group health plan provides a premium differential based on tobacco use . . . . The plan accommodates participants who smoke by facilitating their enrollment in a smoking cessation program . . . reasonably designed based on all of the relevant facts and circumstances . . . . Any participant can avoid the surcharge for the plan year by participating in the program, regardless of whether the participant stops smoking, but the plan can require a participant who wants to avoid the surcharge in a subsequent year to complete the smoking cessation program again.

29 C.F.R. § 2590.702(f)(4)(vi) (Example 6); 45 C.F.R. § 146.121(f)(4)(vi) (Example 6).

The Court finds that the ordinary meaning of the term "full reward," as used in 42 U.S.C. § 300gg-4(j)(1)(C) and its implementing regulations, is the full amount of an annual surcharge for a health factor. The word "full" is defined as "containing all that possibly can be placed or put within," *Full*, *Merriam-Webster's Third New International Dictionary* (2002), and "reward" is defined in the PHSA as including "the absence of a surcharge." 42 U.S.C. § 300gg-4(j)(3)(A). Consequently, under the PHSA, all possible absence of a surcharge must be "made available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(3)(D). Indeed, the example of a compliant tobacco surcharge and smoking cessation program provided in the regulations specifies that such a program would allow "any participant [to] avoid the surcharge *for the plan year* by participating in the program." 29 C.F.R. § 2590.702(f)(4)(vi) (Example 6) (emphasis added); 45 C.F.R. § 146.121(f)(4)(vi) (Example 6) (emphasis added). The Court therefore joins several other courts in concluding that "full reward" means the full amount of an annual surcharge for a health factor like tobacco use. *See, e.g.*, *Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 904–05 (E.D. Va. 2025) (agreeing with other courts that "the addition of the qualifying word 'full' before 'reward' . . . removed any doubt that the 'reward' was intended to apply retroactively" to an entire plan year); *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-CV-04179-SRB, 2025 WL 1260700, at *6 (W.D. Mo. Apr. 15, 2025) (finding that plan participants who "adhere to a wellness program" must be "refunded the full amount of the annual surcharge if they do so"). Accordingly, where the PHSA requires that a "full reward under the wellness program shall be made available to all similarly situated individuals," 42 U.S.C. § 300gg-4(j)(3)(D), the Court finds that a wellness program that does not reimburse those who complete a smoking cessation program for the full annual surcharge violates the statute.

Based on this determination, because a smoking cessation program necessarily is completed over a period of time, a wellness program that does not stop charging the tobacco surcharge until after the participant completes the smoking cessation program, and does not retroactively reimburse the participant for surcharges paid earlier in the plan year, fails to provide the "full reward." 42 U.S.C. § 300gg-4(j)(3)(D); *Bokma*, 783 F. Supp. 3d at 889, 905 (holding that, where a surcharge would "be removed only on a prospective basis upon completion of [the smoking cessation program], but not for the entire plan year," the plaintiffs plausibly pleaded a violation of ERISA); *Waggoner v. Carle Found.*, No. 24-CV-2217, 2025 WL 4743424, at *18–20 (C.D. Ill. Sept. 16, 2025) (discussing cases).

Defendants further argue that dismissal of Count 1 is warranted based on the assertion that "Marriott's wellness program permits participants to take a tobacco-cessation program at any time during the plan year and obtain the same premium discount available to non-tobacco users upon enrollment," Mot. at 16, rather than upon completion of the smoking cessation program, such that the full reward for a Plan year is available to participants at least once per year in accordance with the statutory provision requiring that individuals receive "the opportunity to qualify for the reward under the program at least once each year." 42 U.S.C. § 300gg-4(j)(3)(C). If the wellness program is indeed designed in accordance with that statement, it would likely comply with the PHSA because it would provide an opportunity to avoid the full annual surcharge by enrolling in the cessation program at the start of each Plan year. *See Trout v. Meijer, Inc.*, No. 25-CV-1378, 2026 WL 1098213, at *4 (W.D. Mich. Apr. 23, 2026) (holding that where employers must "allow employees to qualify for the full reward at least once per year," so "long as employers meet that requirement, they are free to offer additional opportunities to qualify for a partial reward"). However, the allegations in the Amended Complaint suggest that Defendants stop imposing the

tobacco surcharge only upon completion of the smoking cessation program, not at the time of enrollment, and that it does not retroactively reimburse surcharges paid earlier in the Plan year. The Plan Document, the Enrollment Guide, and the Summary Plan Document do not include provisions that definitively establish whether the tobacco surcharges are discontinued upon enrollment in, or upon completion of, the smoking cessation program. At this early stage, where the Court must construe the factual allegations in the light most favorable to the plaintiff, the Court will not dismiss Count 1 based on this argument. *See Albright*, 510 U.S. at 268.

As for McNeil's allegation that the Plan also fails to provide dependents with a reasonable alternative standard by which to avoid the surcharge, the Court similarly finds that Defendants' materials do not directly contradict this allegation. Defendants identify one page in the Enrollment Guide that states that "Participants (associates and dependents) who use tobacco may be subject to a weekly tobacco surcharge . . . .**" under which a footnote states "**If you think you may be unable to take steps to quit, you might qualify for an opportunity to avoid the surcharge by different means . . . ." Enrollment Guide at 8. Although these statements imply that dependents can access the same smoking cessation program available to employees, they do not foreclose the argument that dependents are not actually able to avoid the surcharge by participating in the smoking cessation program. Further, where the Court has already found that McNeil has plausibly alleged that the smoking cessation program is not a reasonable alternative standard, the Court also declines to dismiss Count 1 as to plan participants who are dependents of an employee.

### C. Notice

In Count 2 of the Amended Complaint, McNeil alleges that Defendants have violated the PHSA, specifically 42 U.S.C. § 300gg-4(j)(3)(E), by failing adequately to disclose the availability of a reasonable alternative standard to avoid the tobacco surcharge in its Enrollment Guide,

Summary Plan Description, and Plan Document. Defendants have attached these documents to their Motion and argue that they include the required notice and thus negate McNeil's allegations in Count 2.

The relevant provision of the PHSA provides that:

> The plan or issuer involved shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under subparagraph (D). If plan materials disclose that such a program is available, without describing its terms, the disclosure under this subparagraph shall not be required.

42 U.S.C. § 300gg-4(j)(3)(E). Applicable regulations similarly state that "[i]f plan materials merely mention that such a program is available, without describing its terms, this disclosure is not required." 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v). If plan materials do describe the terms of an outcome-based wellness program, however, those materials must disclose the availability of a reasonable alternative standard, as well as "contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated." 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v).

The regulations also provide a specific example of "language, or substantially similar language, [that] can be used to satisfy the notice requirement" consisting of the following:

> Your health plan is committed to helping you achieve your best health. Rewards for participating in a wellness program are available to all employees. If you think you might be unable to meet a standard for a reward under this wellness program, you might qualify for an opportunity to earn the same reward by different means. Contact us at [insert contact information] and we will work with you (and, if you wish, with your doctor) to find a wellness program with the same reward that is right for you in light of your health status.

29 C.F.R. § 2590.702(f)(6); 45 C.F.R. § 146.121(f)(6).

The parties do not dispute that the Plan Document and the Summary Plan Description contain no references to the wellness program, whether to the tobacco surcharge or to the smoking

cessation program. Moreover, McNeil acknowledges in his brief that the regulations require only disclosure of the availability of a reasonable alternative standard "in 'all plan materials' describing the program." Opp'n at 14, ECF No. 42. The only identified document at issue that references the wellness program is the Enrollment Guide.

Defendants assert that the Enrollment Guide meets all applicable notice requirements. Page 8 of the Enrollment Guide includes a notice that "Participants (associates and dependents) who use tobacco may be subject to a weekly tobacco surcharge. See page 28 for information on the free Smoking Cessation Program.**" Enrollment Guide at 8. Page 28 of the Enrollment Guide includes in its list of "Life + Work Resources" the following description of the "FREE Smoking Cessation Program":

> If you smoke, one of the healthiest things you can do is to quit. We know it's not easy, but there is help available! Through this program, you can talk to an expert for help and receive free nicotine replacement therapies such as lozenges, gum, and patches. The free Smoking Cessation Program is available to all full-time, part-time, and pool status associates. You don't have to be enrolled in a medical plan to participate.

*Id.* at 28.

A footnote to the notice on page 8 states that:

> **If you think you may be unable to take steps to quit, you might qualify for an opportunity to avoid the surcharge by different means. Contact the mHUB Service Center, and we will work with you (and, if you wish, with your doctor) to find a wellness program with the same reward that is right for you in light of your health status.

*Id.* Page 2 of the Enrollment Guide provides information on how participants may speak to a Plan representative through the mHUB website, a QR code, or an identified phone number. *Id.* at 2.

To the extent that these provisions in the Enrollment Guide do more than merely disclose the availability of the wellness program and can be construed as including a description of its terms, they meet the requirements by disclosing the availability of a reasonable alternative standard

consisting of the smoking cessation program and by providing "contact information for obtaining a reasonable alternative standard." 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v). Although the notice in the Enrollment Guide does not specifically state that "recommendations of an individual's personal physician will be accommodated," 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v), the reference to working with the participant's doctor meets the regulatory requirement. In fact, Defendants' notice on page 2 of the Enrollment Guide uses the exact language from the regulations' example of "language, or substantially similar language, [that] can be used to satisfy the notice requirement" relating to contact information and working with the recommendations of the participant's physician. 29 C.F.R. § 2590.702(f)(6); 45 C.F.R. § 146.121(f)(6).

Nevertheless, McNeil argues that this notice is inadequate because it does not specifically state that both employees and their dependents can access a reasonable alternative standard, or that participants who complete the smoking cessation program mid-year can obtain the full reward, and because the mHUB contact information is not provided in the same section of the Enrollment Guide that includes the notice, even though multiple versions of contact information for mHUB appear on page 2 of the Enrollment Guide. McNeil cites no authority for these arguments, and none of these alleged requirements appear anywhere in the regulations.

Where Defendants' notice of a reasonable alternative standard addresses the statutory and regulatory requirements and in fact uses the sample language provided in 29 C.F.R. § 2590.702(f)(6) and 45 C.F.R. § 146.121(f)(6), the Court concludes that McNeil does not plausibly allege that Defendants have failed to provide the required notice and will dismiss Count 2 of the Amended Complaint. *See, e.g.*, *Waggoner*, 2025 WL 4743424, at *23 (dismissing a similar claim of inadequate notice where "the language in the Plan's disclosure closely mirrors the sample

language referenced in the regulation itself" and "adequately discloses the appropriate contact information for inquiring about the reasonable alternative"); *Knight v. L H C Grp. Inc.*, No. 25-CV-00263, 2025 WL 4351515, at *9 (W.D. La. Nov. 18, 2025) (finding adequate notice in a Benefits Notice of the reasonable alternative standard where the defendant's "notice language is almost verbatim to the sample notice provided" in the regulation but declining to dismiss because the plaintiff plausibly alleged that other plan documents lacked the required notice), *report and recommendation adopted*, No. 25-CV-00263, 2026 WL 513477 (W.D. La. Feb. 24, 2026).

## IV. Breach of Fiduciary Duty

In Counts 3 and 4, McNeil alleges that Defendants breached fiduciary duties and engaged in prohibited transactions in violation of 29 U.S.C. §§ 1104, 1106, and 1109. ERISA imposes personal liability upon "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" in the statute. 29 U.S.C. § 1109(a). ERISA codifies the fiduciary duty of prudence by providing that "a fiduciary shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B); *see DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007). It also codifies the fiduciary duty of loyalty by providing that "a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A); *see DiFelice*, 497 F.3d at 417–18. ERISA also categorically bans certain prohibited transactions that are likely to cause injury to a plan, which include any "direct or indirect . . . transfer to, or use by or for the

benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D); *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1025 (2025). ERISA also bars a transaction between the plan and a fiduciary through which the fiduciary "deal[s] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

The right within ERISA to assert a claim for a breach of fiduciary duty is set forth in 29 U.S.C. § 1132, which provides, as relevant here, that a civil action may be brought "by a participant, beneficiary, or fiduciary" for appropriate relief under [§ 1109]." 29 U.S.C. § 1132(a)(2). It further provides that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," or (B) to obtain other appropriate equitable relief . . . to redress such violations. 29 U.S.C. § 1132(a)(3). In Count 3, based on the authority in § 1132(a)(2), McNeil alleges a breach of a fiduciary duty owed to the Plan, and in Count 4, based on the authority in § 1132(a)(3), he alleges a breach of a fiduciary duty owed to the individual Plan participants.

Defendants seek dismissal of Counts 3 and 4 on the grounds that the actions at issue are not those for which a fiduciary duty is owed or was breached, and that McNeil has not alleged sufficient facts to establish prohibited transactions in violation of § 1106. Defendants also seek dismissal of Count 3 based on a lack of standing and a failure to state a claim based on the argument that McNeil has failed to allege facts demonstrating that the Plan suffered a financial loss as a result of Defendants' conduct. In addition to their standing argument addressed above, *see supra* part II, Defendants seek dismissal of Count 4 because they assert that McNeil seeks but cannot recover monetary damages based on a breach of fiduciary duty.

### A. Fiduciary Acts

As a threshold issue, Defendants argue that Marriott, the Plan Sponsor, is not a fiduciary in relation to any of the conduct alleged in the breach of fiduciary duty claims because it acted only as a settlor with respect to creating and structuring the tobacco wellness program. As relevant here, ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). For purposes of an ERISA fiduciary duty claim, a person is a fiduciary "only as to the activities which bring the person within [this] definition." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992).

In *Coyne & Delany Co. v. Selman*, 98 F.3d 1457 (4th Cir. 1996), the Fourth Circuit stated that "a plan sponsor does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits." *Id.* at 1465. However, the court further concluded that "a plan sponsor does become a fiduciary under the [ERISA] definition if (that is, 'to the extent') it retains or exercises 'any discretionary authority' over the management or administration of a plan." *Id.* (quoting 29 U.S.C. § 1002(21)(A)). In addition, where "an employer is entrusted with employee funds for remittance to a claims administrator, along with any employer contributions, the employer is acting in a fiduciary capacity under ERISA." *Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 219 (4th Cir. 2005).

Here, McNeil has alleged that Marriott has "profit[ed] by retaining [the surcharge funds] in its own accounts, earning interest, and failing to remit the full employer contribution owed to the Plan," Am. Compl. ¶ 80, and Marriott does not contest that it was entrusted with remitting

employee funds to the Plan. The Court therefore finds that Marriott acts as fiduciary in relation to its obligation to remit all funds due to the Plan.

As for whether the Benefits Department was acting as a fiduciary, there is no dispute that as the Plan Administrator, the Benefits Department acts as a fiduciary. Defendants' only argument is that the Benefits Department has complied with its fiduciary duty by following lawful Plan terms. Where, as discussed above, McNeil has plausibly alleged that certain Plan terms are not lawful, *see supra* part III, the Court finds no basis to dismiss the breach of fiduciary duty claims against the Benefits Department on this basis.

**B. Fiduciary Duties**

As to both Counts 3 and 4, Defendants argue that McNeil has not alleged a viable claim of a breach of fiduciary duty. Most specifically, McNeil alleges that Defendants have breached their fiduciary duties of prudence and loyalty by using the allegedly excessive tobacco surcharges "to displace Marriott's own contributions" and to "profit by retaining [the surcharge funds] in [Marriott's] own accounts, earning interest, and failing to remit the full employer contribution owed to the Plan." Am. Compl. ¶ 80. Defendants argue that this conduct does not breach a fiduciary duty, in part because Marriott's withheld contributions are not "plan assets." Mot. at 25–27. Although withheld employer contributions are not clearly identified in the statute as plan assets, Defendants also contend that McNeil cannot assert a breach of fiduciary duty claim in relation to the tobacco surcharge funds because those funds are not plan assets upon withholding from participants' paychecks. The Plan Document states that "[e]xcept as may otherwise be required by law, any amount by which a Participant's Compensation is reduced by reason of an election made under this Plan will remain part of the general assets of the Employer," and that "[e]xcept as specifically provided in the Supplemental Documents, nothing herein will be

construed to require any Employer or the Plan Administrator to maintain any fund or segregate any amount for the benefit of any Enrolled Person." Plan Document ¶ 10.04. However, by regulation, "the assets of the plan include amounts . . . that a participant has withheld from his wages by an employer, for contribution . . . to the plan, as of the earliest date on which such contributions . . . can reasonably be segregated from the employer's general assets," and that "in the case of amounts withheld by an employer from a participant's wages," such withholdings become plan assets on "the date on which such amounts would otherwise have been payable to the participant in cash." 29 C.F.R. § 2510.3-102(a)(1), (c). Accordingly, the Court will not dismiss McNeil's allegations of the misuse of tobacco surcharge funds on the grounds that those funds were not plan assets.

Defendants' citation to *Phelps v. CT Enterprises*, 194 F. App'x 120 (4th Cir. 2006), does not alter this conclusion. Although *Phelps* stated that fiduciaries have "an obligation to ensure that participant contributions are applied only to the payment of benefits and reasonable administrative expenses of the plan," and that there is a fiduciary duty "to ensure that employee contributions were not used for the company's general operating expenses," it did not conclude that the only way to breach a fiduciary duty is to use employee contributions for such expenses. *Id.* at 123–24.

Here, where McNeil has asserted that Defendants use the allegedly excessive tobacco surcharges "to displace Marriott's own contributions" and to "profit by retaining [the surcharge funds] in its own accounts, earning interest, and failing to remit the full employer contribution owed to the Plan," Am. Compl. ¶ 80, the Court finds that the allegations plausibly plead that Marriott violated its duty of loyalty to act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A); *see Bokma*, 783 F. Supp. 3d at 902 (finding a plausible

claim of a breach of a fiduciary duty based on allegations that the defendant "collected and held Plan assets, in the form of unlawful tobacco surcharges," "failed to contribute as much of its own assets to the Plan," and thereby "saved the money it would have had to contribute to the Plan").

As for Defendants' argument that the Benefits Department did not breach a fiduciary duty because it complied with the terms of the Plan, ERISA provides that "a fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D). Where a plaintiff "specifically allege[s] that Defendant[s] breached the duties of prudence and loyalty by collecting an unlawful surcharge," Defendants "may not lean on [their] adherence to the Plan as a shield from liability." *See Bokma*, 783 F. Supp. 3d at 903. Because McNeil has plausibly alleged that the tobacco surcharges were excessive under the law, he has sufficiently alleged that Defendants failed to act "solely in the interest of the participants and beneficiaries" and thereby breached a fiduciary duty. 29 U.S.C. § 1104(a)(1).

Accordingly, the Court joins several other courts in concluding that allegations such as those asserted by McNeil are sufficient to state plausible claims for a breach of a fiduciary duty. *See, e.g.*, *Bokma*, 783 F. Supp. 3d at 902; *Bailey*, 2025 WL 2779899, at *22, *Waggoner*, 2025 WL 4743424, at *30–31.

**C. Prohibited Transactions**

In relation to its codification of the fiduciary duty of loyalty, ERISA "categorically bar[s] certain transactions" that are likely to cause injury to a plan, referred to as "prohibited transactions." *Cunningham*, 145 S. Ct. at 1025 (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000)); 29 U.S.C. § 1106(a)(1). In Counts 3 and 4, McNeil alleges that Defendants engaged in prohibited transactions, in violation of 29 U.S.C. § 1106(a)(1)

and 29 U.S.C. § 1106(b)(1), by unlawfully withholding tobacco surcharges from Plan participants' paychecks and "using those funds to reduce its own financial obligations to the Plan." Am. Compl. ¶ 98. In opposing the Motion, McNeil has clarified that his prohibited transactions claim focuses on 29 U.S.C. § 1106(a)(1)(D), which provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows such a transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

A "party in interest" is defined as including "any fiduciary," as well as "an employer any of whose employees are covered by such plan." 29 U.S.C. § 1002(14). The United States Supreme Court has stated that "a 'transaction' in the sense that Congress used that term" in 29 U.S.C. § 1106(a) refers to "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length" that "generally involve uses of plan assets that are potentially harmful to the plan," which may include a sale, exchange, or leasing of property; the lending of money; extending credit; furnishing goods, services, or facilities, and the acquisition of real property. *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996).

Here, McNeil's prohibited transactions claim relies on the allegation that Defendants collected excessive tobacco surcharges, then commingled those tobacco surcharges with general assets and improperly earned interest on those funds. Where McNeil does not contest that Defendants are permitted to collect tobacco surcharges and instead claims only that Defendants overcharge certain Plan participants, the Court finds that this activity does not constitute a transaction within the meaning of § 1106(a), as it is not a "commercial bargain . . . struck with plan insiders, presumably not at arm's length." *Id.* Indeed, there is not even a transmittal of surcharge funds from Plan participants to Marriott; rather, Marriott pays slightly less money to

Plan participants subject to the tobacco surcharge than it otherwise would have paid. For the same reason, the act of maintaining certain funds and earning interest on those funds also cannot reasonably be deemed to be a "transaction." *See id.* The Court therefore concludes that McNeil has not plausibly alleged that Defendants engaged in a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D).

McNeil asserts that the same allegations support a prohibited transactions claim under 29 U.S.C. § 1106(b)(1), which provides that, in relation to transactions between a plan and a fiduciary, "[a] fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b). Where 29 U.S.C. § 1106(b)(1) is entitled "[t]ransactions between plan and fiduciary," the Court finds that this provision is similarly limited to prohibiting "transactions." *Id.* For the reasons stated above, McNeil has alleged no such transaction. *See Buescher v. N. Am. Lighting, Inc.*, 791 F. Supp. 3d 873, 897 (C.D. Ill. 2025) (dismissing a prohibited transaction claim under § 1106(b) based in part on the fact that because "transactions tend to involve multiple parties and some sort of exchange between them," the "movement of funds within the Plan does not fit neatly within the plain meaning of 'transaction'"). Accordingly, the Court also concludes that McNeil has not stated a claim for prohibited transactions under 29 U.S.C. § 1106(b)(1) and will dismiss the claims in Counts 3 and 4 to the extent that they are based on prohibited transactions.

**D. Count 3: Breach of Fiduciary Duty (Plan-Level Relief)**

Defendants contend that Count 3, a breach of fiduciary duty claim based on 29 U.S.C. § 1109, asserted based on the authority set forth in 29 U.S.C. § 1132(a)(2), must be dismissed because McNeil has failed to state a claim. As relevant here, § 1109 provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

> shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

Defendants assert that both as a matter of Article III standing and a failure to state a claim, Count 3 should be dismissed because McNeil has not sufficiently alleged that the Plan suffered financial loss from the alleged breach of fiduciary duty. Defendants rely on *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008), in which the Supreme Court held that, as to claims for a breach of fiduciary duty relating to a defined benefit pension plan, § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries." *Id.* at 256. Although *LaRue* further held that § 1132(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," that principle applies only to a defined contribution pension plan. *Id.* Where McNeil's claims relate to a welfare benefit plan, rather than a defined contribution pension plan, and there are no allegations that Plan participants have individual accounts comparable to those at issue in a defined contribution pension plan, this principle is not applicable here. *See* 29 U.S.C. § 1002(1) (defining an "employee welfare benefit plan," or "welfare plan," as including any plan "established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits"); 29 U.S.C. § 1002(34) (defining a "defined contribution plan" as a type of pension plan that "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account"); 29 U.S.C. § 1002(35) (defining a "defined benefit plan" as a "a

pension plan other than an individual account plan"). Indeed, where the Enrollment Guide describes five categories of medical plans available to participants, each of which guarantees that the Plan will pay a certain percentage of in-network covered services once the participant has paid the deductible, there is no basis to conclude that there are any individual accounts with assets that could have suffered a financial loss based on the alleged breach of fiduciary duty.

Since *LaRue*, the United States Court of Appeals for the Fourth Circuit has reiterated that § 1132(a)(2) "allows plan participants to bring a derivative action to enforce [§ 1109] and 'to obtain recovery for losses sustained by the plan because of breaches of fiduciary duties,'' such that "recovery under [§ 1132(a)(2)] goes to the plan, not to the beneficiary bringing the action." *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 494 (4th Cir. 2023) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985)). Therefore, if a plan participant "wants to recover directly . . . then she would need to sue under a different provision of [ERISA's] enforcement scheme." *Id.* at 494.

Here, McNeil has not alleged a loss to the Plan. Rather, McNeil alleges that Defendants have used the tobacco surcharge funds "to displace Marriott's own contributions" and therefore have "increased [Marriott's] own corporate assets and saved the money it would otherwise have had to contribute to the Plan." Am. Compl. ¶¶ 80, 87. McNeil does not claim that Defendants failed to remit participants' tobacco surcharges to the Plan, that Defendants reduced their contributions to the Plan such that the Plan had less money than it would have had with lawful tobacco surcharges, or that the Plan could not pay out benefits to which participants are entitled. Therefore, McNeil does not allege sufficient facts to demonstrate that Defendants caused a loss to the Plan or left the Plan underfunded. *See David v. Alphin*, 704 F.3d 327, 330, 338 (4th Cir. 2013) (affirming the dismissal of claims under § 1132(a)(2) on standing grounds where the pension plan at issue was "overfunded" as the "[p]lan's assets were more than sufficient to pay out all vested

benefits"); *Trout*, 2026 WL 1098213, at *12 (dismissing the plaintiff's breach of fiduciary duty claims for plan-level relief based on allegedly improper tobacco surcharges because there was no loss to the plan). Where McNeil has not alleged sufficient facts to show that a breach of fiduciary duty caused losses to the Plan, the Court will grant the Motion to Dismiss as to Count 3. *See LaRue*, 552 U.S. at 256.

### E. Count 4: Breach of Fiduciary Duty (Individual Relief)

In Count 4, McNeil alleges a breach of fiduciary duty owed to individual Plan participants and seeks to proceed under 29 U.S.C. § 1132(a)(3), which states, in relevant part, that a civil action may be brought by:

> [A] participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

*Id.*

Defendants argue that, in addition to their Article III standing argument which the Court has already addressed, *see supra* part II, this count should be dismissed because § 1132(a)(3) does not allow for recovery for compensatory damages. In *Rose v. PSA Airlines, Inc.*, 80 F.4th 488 (4th Cir. 2023), the Fourth Circuit held that where "compensatory damages intended to provide monetary relief for all losses sustained as a result of the alleged breach of fiduciary duties are legal, not equitable, relief," and where 29 U.S.C. § 1132(a)(3) addresses only equitable relief, a court may not, pursuant to that provision, grant "relief that amounts to personal liability paid from the defendant's general assets to make the plaintiff whole." *Id.* at 496, 502. Pursuant to § 1132(a)(3), a plaintiff may obtain monetary relief by alleging unjust enrichment arising from a breach of a fiduciary duty and seeking equitable relief in the form of restitution, but such a claim must seek "specific funds that are wrongfully in the defendant's possession and rightfully belong to" the

plaintiff and establish that "the fruits of that unjust enrichment remain in the defendant's possession or can be traced to other assets." *Id.* at 501–02, 505.

Here, McNeil has alleged that Defendants were unjustly enriched by breaching a fiduciary duty, but Defendants argue that he has not sufficiently alleged facts showing that the funds unjustly retained are traceable to "specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds." *Id.* at 504 (quoting *Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan,* 577 U.S. 136, 144–45 (2016)). While McNeil would need to meet this standard to secure monetary relief under § 1132(a)(3), where he alleges specific amounts of improper tobacco surcharges based on a failure to reimburse for surcharges paid earlier in a Plan year, and also alleges that Marriott reduced the amount of its own contributions to the Plan and retained those funds, it is premature, prior to discovery, to conclude that the funds that are the subject of the alleged unjust enrichment, or at least some portion, are not retained by Defendants.

Moreover, in Count 4, McNeil also seeks other forms of equitable relief, including an injunction prohibiting Defendants from "violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan." Am. Compl. at 38. Defendants have not contested that, to the extent that McNeil seeks such an injunction, his claims may proceed under 29 U.S.C. § 1132(a)(3). Accordingly, the Motion will be denied as to Count 4.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the Motion will be granted as to Counts 2 and 3, granted as to the prohibited transaction claims in Count 4, and otherwise denied. A separate Order shall be issued.

Date: August 18, 2026

THEODORE D. CHUANG
United States District Judge